## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CELLINO & BARNES, P.C., on behalf of itself and all others similarly situated, <br><br> *Plaintiff*, <br><br> – v. – <br><br> HEARST TELEVISION, INC., GRAY TELEVISION, INC., NEXSTAR MEDIA GROUP, INC., TEGNA, INC., TRIBUNE MEDIA COMPANY, and SINCLAIR BROADCAST GROUP, INC., <br><br> *Defendants*. | Civil Case No.:_____ <br><br><br> JURY TRIAL DEMANDED |

## ANTITRUST CLASS ACTION COMPLAINT

Plaintiff Cellino & Barnes, P.C. ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class," as defined below), upon personal knowledge as to the facts pertaining to itself and upon information and belief as to all other matters, and based on the investigation of counsel, brings this class action for damages, injunctive relief, and other relief pursuant to federal antitrust laws, demands a trial by jury, and alleges as follows:

## NATURE OF ACTION

1.      This antitrust action concerns the illegal and anticompetitive practices of Defendants Hearst Television, Inc. ("Hearst"), Gray Television, Inc. ("Gray"), Nexstar Media Group, Inc. ("Nexstar"), Tegna, Inc. ("Tegna"), Tribune Media Company ("Tribune"), and Sinclair Broadcast Group, Inc. ("Sinclair"), (collectively, "Defendants"), who engaged in unlawful collusion and conspired to artificially inflate the price of local television advertisements in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2.      This case is filed in this district because: (1) the New York Designated Marketing Area ("DMA"), which includes New York City, Long Island, portions of New

York State, Connecticut, New Jersey, and Pike County, Pennsylvania is the largest in the U.S., comprising more than 7.3 million television households; (2) Plaintiff purchased significant amount of television advertising from one or more Defendants in this district during the Class Period; (3) Defendants had ample opportunities to conspire through membership and attendance at industry associations, including the Television Bureau of Advertising, Inc., the Media Rating Council, both of which are located in New York City, and at the industry's up-front television advertising sales event which is held annually in New York City and attended by Defendants' senior executives and representatives; and (4) Defendant Hearst has its headquarters in this district.

3. Defendants sell television advertising to local advertisers in multiple Designated Market Areas ("DMAs") throughout the U.S. New York City is the largest DMA, reaching more than 7.3 million households. A DMA is a geographic area for which A.C. Nielsen Company furnishes broadcast television stations, and others with data to aid in evaluating audience size and composition.

4. Plaintiff seeks to represent a Class consisting of all persons and entities in the U.S. who paid for all or a portion of advertisement time on local TV provided by Defendants from at least January 1, 2012 until the effects of their unlawful conduct cease (the "Class Period").

5. During the Class Period, Defendants unlawfully shared information and coordinated efforts to artificially inflate prices for television commercials. Specifically, instead of competing with each other on prices for advertising sales, as competitors normally do, Defendants and their co-conspirators shared proprietary information and conspired to fix prices and reduce competition in the market.

6.      On July 26, 2018, *The Wall Street Journal* and other media outlets reported that Sinclair, Tribune, and certain independent local television stations are the subjects of an ongoing U.S. Department of Justice ("DOJ") investigation regarding whether communication between the stations' ad sales teams led to higher rates for TV commercials. Later that day, Newsmax.com, an online news journal, reported that Defendants Hearst, Nexstar, and Tegna are also involved in the DOJ probe.

7.      The impact of Defendants' unlawful and anticompetitive conduct is ongoing and continues to this day and requires injunctive relief to prevent future harm to Plaintiff and members of the Class.

8.      Until the publication of reports regarding the DOJ investigation on July 26, 2018, Defendants fraudulently concealed their unlawful conduct from Plaintiff and members of the Class, and Plaintiff and members of the Class had no way of knowing the advertising rates they were paying were the result of unlawful collusion.

9.      Plaintiff and members of the Class seek injunctive relief and damages for their injuries caused by Defendants' collusive, manipulative, and anticompetitive restraint of competition in the market for television advertising in the U.S. Specifically, Plaintiff seeks injunctive relief, treble damages, costs of suit, and reasonable attorneys' fees on behalf of itself and the Class of direct purchasers, as defined herein, pursuant to Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

## JURISDICTION AND VENUE

10.     Plaintiff brings this class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover damages suffered by the Class and the costs of suit, including reasonable attorneys' fees; to enjoin Defendants' anticompetitive conduct; and for such other relief as is afforded under the antitrust laws of the U.S. for Defendants'

3

violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 26.

12.     Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 28 U.S.C. §§ 15, 22, and 26, and pursuant to 28 U.S.C. § 1391(b), (c), and (d), because, at all times relevant to the Complaint, one or more of the Defendants resided, transacted business, was found, or had agents in this District and for the reasons alleged above in Paragraph 2.

## **PARTIES**

### A.     **PLANTIFF**

13.     Plaintiff is law firm with offices in this District at 420 Lexington Avenue, New York, NY 10170, and throughout New York State, including in Buffalo, Garden City, Melville, and Rochester.  During the Class Period, Plaintiff purchased advertisement time directly from one or more of the Defendants in the New York DMA and has suffered monetary loss as a result of the antitrust violations alleged herein.

### B.     **DEFENDANTS**

14.     Defendant Hearst is headquartered at 300 West 57th Street, New York, New York 10019 and is a diversified media and information company. Hearst operates television stations and cable networks throughout the U.S.  According to its website, Hearst has ownership interests in 31 televisions stations which reach a combined 19% of U.S. viewers.

15.     Defendant Gray is a television broadcast company headquartered at 4370 Peachtree Road, NE, Suite 400, Atlanta, Georgia 30319. Gray owns and operates television stations and digital assets in the U.S. As of February 23, 2018, Gray owned and operated television stations in 57 television markets, broadcasting approximately 200 program streams, including approximately 100 channels affiliated with the CBS Network, the NBC

Network, the ABC Network, and the FOX Network. On June 23, 2018, Gray entered into a merger agreement with, among others, Raycom Media, Inc. Giving effect to the merger and prior to divestitures of stations due to market overlaps, Gray expects to own and/or operate 142 full-power television stations serving 92 markets. Upon completion, Gray expects to reach approximately 24 percent of U.S. television households through nearly 400 separate program streams including approximately 165 affiliates of the ABC/NBC/CBS/FOX networks, and over 100 affiliates of the CW, My Network, and MeTV networks.

16.     Defendant Nexstar is headquartered at 545 East John Carpenter Freeway, Suite 700, Irving, Texas 75062, and operates as a television broadcasting and digital media company in the U.S. As of December 31, 2017, the company owned, operated, programmed, or provided sales and other services to 170 television stations in 100 markets.

17.     Defendant Tegna is a broadcasting, digital media, and marketing services company and is headquartered at 7950 Jones Branch Drive, McLean, Virginia 22107. Tegna owns and operates 47 television stations in 39 markets across the U.S.

18.     Defendant Tribune is headquartered at 515 North State Street, Chicago, Illinois 60654 and operates, through its subsidiaries, as a media and entertainment company in the U.S.  Tribune offers news, entertainment, and sports programming through Tribune Broadcasting local television stations, including FOX television affiliates, CW Network television affiliates, CBS television affiliates, ABC television affiliates, MY television affiliates, NBC television affiliates, and independent television stations; and television series and movies on WGN America, a national general entertainment cable network. Tribune owns 43 broadcast television stations in approximately 35 cities.

19.     Defendant Sinclair is headquartered at 10706 Beaver Dam Road, Hunt Valley, Maryland 21030 and operates as a television broadcast company in the U.S. As of December

5

31, 2017, it owned, operated, and/or provided services to 191 stations in 89 markets, which broadcast 601 channels.

### C. AGENTS AND CO-CONSPIRATORS

20. The acts alleged against the Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

21. Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

22. Each Defendant acted as the principal, agent, or joint venture of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

### FACTUAL ALLEGATIONS

### A. The U.S. Department of Justice Investigation

23. On July 26, 2018, *The Wall Street Journal* reported that the DOJ is investigating whether Defendants Sinclair, Tribune, and other local television station owners unlawfully shared information and coordinated efforts to artificially raise prices for television commercials. Later that day, Newsmax.com, an online news journal, reported that, Defendants Hearst, Nexstar, and Tegna are also involved in the DOJ probe.

24. Upon information and belief, during the review of a proposed $3.9 billion acquisition of Sinclair and Tribune, the DOJ uncovered anti-competitive market information that led it to investigate Defendants' conspiracy to artificially inflate television advertising prices. Specifically, the DOJ is investigating whether Defendants "coordinated efforts when their ad sales teams communicated with each other about their performance" in order to artificially inflate television advertising prices in violation of federal antitrust laws.

6

25. On August 9, 2018, Tribune announced its withdrawal from its $3.9 billion merger with Sinclair.

### B. The Local Television Advertising Market

26. The local television landscape in the U.S. is made up of parent companies who own dozens of local TV stations that carry programming distributed through their broadcast platform, consisting of programming provided by third-party network and syndicators, local news, their own networks, and other original programming.

27. Defendants sell television advertising to local advertisers in multiple DMAs throughout the U.S. A DMA is a geographic area for which A.C. Nielsen Company furnishes broadcast television stations, and others with data to aid in evaluating audience size and composition.

28. The New York City region is the largest DMA, reaching more than 7.3 million households. There are 210 DMAs in the U.S. According to Nielsen, the key benefits to DMAs including: 1) targeting local advertising and direct marketing campaigns across multiple media; 2) selling advertising by local television market; 3) selecting local research samples; and 4) segmenting and analyzing internal and third-party data by local television market.

29. In recent years, television broadcasting companies have experienced significant slowing of growth in their advertising revenues due to increased competition from internet and other advertising. The following chart depicts the slowing growth of television advertising spending in the U.S. since 2012:



30. In response to reduced spending, Defendants conspired to artificially inflate advertising prices in order to stabilize and grow revenues.

31. For example, television up-front advertising prices have increased steadily since 2012. In the television industry, an upfront is a gathering at the start of important advertising sales periods, held by television network executives and attended by major advertisers and the media. It is so named because of its main purpose, to allow marketers to buy television commercial airtime "up front", or several months before the television season begins. Up-front advertising account for a substantial portion of Defendants' revenues. In the U.S., the major broadcast networks' upfronts traditionally occurred in New York City, starting in March or May each year.

32. Since 2012, despite stagnant and decreasing demand, up-front prices have materially increased:



33.     Given the above factors, Defendants and their co-conspirators have responded to falling advertisement sales by colluding on pricing, forcing Plaintiff and members of the Class to pay supracompetitive prices for local television advertising.

### 1.      The Structure and Characteristics of the Market for Local Television Advertising Supports the Existence of a Conspiracy

34.     The structure and other characteristics of the market for local television advertising make it conducive to anticompetitive conduct among Defendants, and make collusion particularly attractive. Specifically, the local television advertising market (1) is in an industry that has been rapidly consolidating and is becoming increasingly concentrated; (2) has high barriers to entry; and (3) is comprised of participants who had motives and ample opportunities to conspire.

### a.      The Local Television Industry Is Rapidly Consolidating

35.     A highly-concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

36.     In response to decreased advertisement spending, the local television industry market has been consolidating in recent years. This consolidation of the market continues as

station owners look to increase their leverage with broadcast networks, which supply much of their programming, and pay-TV distributors, which carry their channels. In 2013, "big owners of local TV stations got substantially bigger, thanks to a wave of station purchases."

37.     Additionally, in February 2018, E.W. Scripps Co., another local television station owner indicated that its "priority is in-market consolidation to create duopolies."

38.     Moreover, on June 25, 2018 Defendant Gray TV agreed to buy fellow television-station owner Raycom Media Inc. in a $3.65 billion deal that would create a company that reaches nearly a quarter of U.S. TV households. If the Gray-Raycom deal is completed, the combined company would own 142 television stations in 92 U.S. markets, reaching 24% of TV households and owning the third-largest number stations.



**b.**     **Several Challenges Restrict Access to the Local Television Market**

39.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing. When, however, there are significant barriers to entry, new entrants are much less likely to enter the market. Thus, barriers to entry help facilitate the formation and maintenance of a cartels and market-allocation agreements. In a conspiracy that increases the prices for consumers, market forces would typically attract new entrants seeking to exploit

the pricing gap created by the conspiracy's supracompetitive pricing. But where, as here, there are high barriers to entry for an industry, new broadcast television companies are less likely to enter the market.

40.     New entrants planning to enter into broadcasting markets typically face six critical barriers (1) governmental policy; (2) the presence of dominant broadcasters; (3) access to content; (4) audience behavior; (5) consumer costs; and (6) capital requirements.

41.     Governmental policy, including regulatory or administrative practices may restrict market access. Responsible authorities take into account economic as well as cultural and social factors when issuing broadcasting licenses which may lead to distortions of competition.

42.     The existing dominant broadcasters usually have long-established relationships with its viewers and most likely also with advertisers. New entrants in the market would have to offer a better deal than the existing broadcasters in order to usurp any market share.  Additionally, bigger companies have more clout to negotiate programming deals with networks or syndicators. "If you wanted a decent seat at the table talking to those guys, you had to have scale," said Barry Lucas, senior vice president of research at the investment firm Gabelli & Co. "Otherwise you were irrelevant and got pushed around." A new entrant to the market would have to invest significant capital and time in establishing itself before it could work with networks.

43.     Additionally, successful entry into television broadcasting markets requires access at reasonable prices to desirable programming, including production or acquisition from third parties. Acquisition of this content, which is critical to attract viewers, is likely to constitute a significant cost to new market players.

44.     Commercial broadcasters, whose operations are primarily financed through advertising fees, must establish within a short period of time an audience base that will also

attract a sufficient number of advertisers. Therefore, in the presence of established dominant broadcasters, new entrants must provide offers attractive enough to convince viewers to alter their already existing patterns of viewing and channel choice—a task that proves to be difficult.

45.     Most likely, new entrants to the market will offer television broadcasting services using cable, satellite, or digital terrestrial technologies—all of which require viewers to incur hardware related costs. The inconvenience and costs that viewers may encounter when switching between different television broadcasters have the potential of discouraging them from altering their established patterns of viewing. For example, consumers who switch from one cable television provider to another generally have to incur costs related to the rental or purchase of adequate equipment, such as set-top boxes and will have to trade in the old equipment for the new equipment.

46.     Finally, it would require considerable funding, time, and technical sophistication for a potential market entrant to gain the economies of scale and audience base achieved by Defendants necessary to compete in the market for local television advertising. For example, Defendant Sinclair "believe[s] the greatest opportunity for a sustainable and growing customer base lies within [its] local communities" which it has developed by training "a strong local sales force at each of [its] television stations, which is comprised of approximately 800 marketing consultants and 100 local sales managers company-wide." Where the level of capital required is prohibitively high, it constitutes a significant barrier to entry.

### c.     Defendants Had Motives and Opportunities to Conspire with Each Other

47.     In 2017, U.S. television advertising sales fell 7.8 percent to $61.8 billion, the steepest drop experienced by the industry in at least 20 years. According to data from

MagnaGlobal, a resource that develops investment strategies for industry heads, there is no sign of a pickup in 2018:



**Drop in National TV Ads Forecast**
The ad-buying firm Magna said that national TV ad sales fell 2.2 percent in 2017. It predicted that they would decline at least 2 percent each year through 2022.

The forecast excludes local TV and ads from cyclical events like the Olympics and U.S. presidential campaigns.

By The New York Times | Source: Magna

48.     "In a healthy economy, we're looking at no growth in advertising from traditional media companies," said Michael Nathanson, an analyst with research firm, MoffettNathanson. "That's a worrying trend." The decline in television viewership is accelerating due to increased investments in the online video advertising market, capturing almost every new advertising dollar entering the marketplace. Almost half of the growth in local video ad spending during the next five years will go to digital platforms, including local mobile video, local online video and out-of-home video, according to a new study on advanced television advertising published last week by BIA/Kelsey industry analysts. "Television ad sales have fallen even as global advertising grows, leading research firms and analysts to predict that the business may never recover."

49.     According to Defendant Sinclair's annual report for the year ended December 31, 2017 filed with the U.S. Securities and Exchange Commission on Form 10-K, a primary source of revenue for local television stations is "the sale of commercial inventory on . . .

television stations to . . . advertising customers." However, Defendant Sinclair also concedes that "advertising revenue can vary substantially from period to period based on many factors beyond [its] control." Further, "[t]his volatility affects [its] operating results and may reduce [its] ability to repay indebtedness or reduce the market value of [its] securities." Defendant Sinclair specifically admits that its "operating results depend on the amount of advertising revenue [it] generate[s]."

50.     As Defendants largely rely on revenue from local television advertising in order to sustain their daily operations, in the face of declining sales, Defendants had reason and motivation to conspire to artificially raise the prices of local TV advertisements.

51.     Moreover, Defendants had numerous opportunities to meet and conspire with each other and to perform acts necessary for the operation and furtherance of the conspiracy. In particular, almost 300 full-power local TV stations changed hands in 2013 and many of these deals resulted in stations in the same market being separately owned on paper but operated jointly, a practice that has grown exponentially in recent years. As of 2014, joint service agreements of one kind or another existed between Defendants and other local TV station owners in at least 94 markets, almost half of the 210 local television markets nationwide, and up from 55 in 2011. Specifically, Defendant Sinclair admits that "[c]ertain of [its] stations have entered into agreements with other stations in the same market, through which [it] provide[s] programming and operating services[,] . . . sales services[,] and other non-programming operating services."

52.     Additionally, Defendants and their co-conspirators had numerous opportunities to conspire through industry associations such as the Television Bureau of Advertising, Inc. ("TVB"), the National Association of Broadcasters ("NAB"), and the Media Rating Council ("MRC"), conferences and meetings held by those associations, and through merger negotiations.

53. Defendants Hearst, Nexstar, Sinclair, Tegna, Gray, and Tribune are members of TVB, which is headquartered at 3 East 54th Street, New York, NY. Nexstar's President and CEO serves as the Chairman of TVB. TVB is a "not-for-profit trade association representing America's $21 billion local broadcast television industry." TVB is designed to bring together and encourage information sharing among employees of broadcast television companies, including Defendants, especially advertising sales representatives.

54. On November 20, 2017, a group of broadcast television companies, including Defendants Hearst, Nexstar, Sinclair, Tegna, and Tribune, announced the launch of the TV Interface Practices or "TIP" Initiative, described as "an industry work group dedicated to developing standard-based interfaces to accelerate electronic advertising transactions for local TV broadcasters and their media agency partners." Defendant Nexstar's President and CEO made a public statement regarding TIP indicating that the industry "must work together as an industry." President and CEO of Defendant Sinclair echoed this sentiment stating that "[t]he TIP Initiative demonstrates the industry's shared commitment to working together" to grow their advertising sales. Defendant Tribune's President and CEO also indicated that through the TIP Initiative, Defendants could "actively work[] together."

55. Defendants are also members of the NAB, which describes itself as the "premier trade association for broadcasters." Defendant Tegna's President and CEO and Defendant Hearst's President both serve on NAB's Executive Committee. Defendant Gray's Chairman, President, and CEO, Defendant Nexstar's Chairman, President and CEO, Defendant Sinclair's President and CEO, and Defendant Tribune's COO each serve on the NAB Television Board of Directors. NAB hosts numerous meetings and other events for industry members throughout the year, which are attended by Defendants' executives.

15

56.     Defendants and several other local television station owners are also members of MRC. MRC boasts that one of the "[b]enefits of MRC [m]embership" is that "[m]embers are exposed to other members' ideas and thoughts".

## FRAUDULENT CONCEALMENT AND
## TOLLING OF THE STATUTE OF LIMITATIONS

57.     Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of the conspiracy and conduct alleged herein. Through no fault or lack of diligence, Plaintiff and members of the Class were deceived and had no knowledge regarding Defendants' collusion to fix, maintain, stabilize, and/or artificially inflate prices in the market for the sale of television advertising and could not reasonably discover the collusion.

58.     The very nature of Defendants' conspiracy was secret and self-concealing. Defendants engaged in market manipulation that could not be detected by Plaintiff and members of the Class.

59.     Plaintiff and members of the Class had no facts sufficient to place them on inquiry notice of the conspiracy alleged herein until July 26, 2018, when *The Wall Street Journal* published an article reporting that the DOJ was investigating collusion between Defendants and their coconspirators to inflate prices in the market for the sale of television advertising.

60.     As alleged herein, Defendants' collusion to fix prices in the market for the sale of television advertising was material to Plaintiff and members of the Class at all relevant times. Within the time period of any applicable statute of limitations, Plaintiff and members of the Class could not have discovered through the exercise of reasonable diligence that Defendants and their co-conspirators were colluding to fix, maintain, stabilize, and/or

artificially inflate prices for television advertising, which Defendants fraudulently concealed.

61.     Plaintiff and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants and their co-conspirators were colluding to fix, maintain, stabilize, and/or artificially inflate prices for television advertising.

62.     Defendants knowingly, actively, and affirmatively concealed the facts alleged herein, including their collusion to fix, maintain, stabilize, and/or artificially inflate prices in the market for the sale of television advertising.

63.     Plaintiff and Class members reasonably relied on Defendants' knowing, active, and affirmative concealment.

64.     For these reasons, all applicable statutes of limitations have been tolled based on the discovery rule and Defendants' fraudulent concealment and Defendants are estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

65.     Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class (the "Class"):

> All persons and entities in the U.S. who paid for all or a portion of the cost of advertisement time directly to Defendants, or any current or former subsidiary or affiliate of Defendants, or any co-conspirator, during the period from at least and including January 1, 2012 until the effects of Defendants' unlawful conduct ceases. Excluded from the Class are Defendants, their parent companies, subsidiaries, affiliates, agents, co-conspirators, federal governmental entities and instrumentalities of the federal government, and states and their subdivisions, agencies and instrumentalities.

66.     While Plaintiff does not know the exact number of members of the Class, Plaintiff believes the class size is numerous given Defendants' substantial nationwide presence.

67.     Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' unlawful anticompetitive conduct, which was generally applicable to all the members of the Class, thereby making appropriate relief with respect to the Class as a whole. Such questions of law and fact common to the Class include, but are not limited to:

(a)     Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to restrict output and fix, raise, maintain or stabilize the prices of local television advertising time;

(b)     The identity of the participants of the alleged conspiracy;

(c)     The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)     Whether the alleged conspiracy violated Section 1 of the Sherman Act;

(e)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Class;

(f)     The effect of the alleged conspiracy on the cost of local television advertising time during the Class Period;

(g)     Whether the Defendants and their co-conspirators fraudulently concealed the existence of their anticompetitive conduct from Plaintiff and the members of the Class;

(h)     The appropriate injunctive and related equitable relief for Plaintiff and the Class; and

(i)     The appropriate class-wide measure of damages.

68.     Plaintiff's claims are typical of the claims of the members of the Class, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for local television advertising time provided by Defendants and/or their co-conspirators.

69.     Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class.  Plaintiff is represented by competent counsel who are experienced in the prosecution of antitrust and class action litigation.

70.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

71.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

72.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## INTERSTATE TRADE AND COMMERCE

73.     Billions of dollars of transactions in local television advertisements are entered into each year in interstate commerce in the U.S. and the payments for those transactions flowed in interstate commerce.

74.    Defendants' manipulation of the market for the sale of local television advertising had a direct, substantial, and foreseeable impact on interstate commerce in the U.S.

75.    Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the U.S., by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for local television advertising.

76.    Defendants' unlawful conduct has a direct and adverse impact on competition in the U.S. Absent Defendants' combination, conspiracy, and/or agreement to manipulate the market for the sale of local television advertising, the prices of local television advertising would have been determined by a competitive, efficient market.

### PLAINTIFF AND THE CLASS SUFFERED ANTITRUST INJURY

77.    Defendants' antitrust conspiracy, conspiracy to monopolize, attempted monopolization, and monopolization had the following effects, among others:

(a)    Price competition has been restrained or eliminated with respect to local television advertising;

(b)    The prices of local television advertising have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)    Purchasers of local television advertising time have been deprived of the benefits of free and open competition; and

(d)    Purchasers of local television advertising time paid artificially inflated prices.

78.    The purpose of the conspiratorial and unlawful conduct of Defendants and their co-conspirators was to fix, raise, stabilize and/or maintain the price of local television advertising time.

79.    The precise amount of the overcharge impacting the prices of local television advertising time paid by Plaintiff and the Class can be measured and quantified using well-accepted models.

80.     By reason of the alleged violations of the antitrust laws, Plaintiff and the members of the Class have sustained injury to their businesses or property, having paid higher prices for local television advertising time than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

### FIRST COUNT
### Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)
### (Conspiracy in Restraint of Trade)

81.     Plaintiff repeats the allegations set forth above as if fully set forth herein.

82.     From at least January 1, 2012 until the effects of their unlawful conduct ceases, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy with regards to local television advertising in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

83.     The contract, combination or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, stabilize or maintain at artificially high levels the prices they charged for local television advertising time in the U.S.

84.     In formulating and effectuating this conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including:

(a)     participating in meetings and conversations among themselves during which they agreed to charge prices at certain levels, and otherwise to fix, increase, maintain, or stabilize prices of local television advertisements in the U.S.; and

(b)     participating in meetings and conversations among themselves to implement, adhere, and police the agreements they reached.

85.     Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, raise, or stabilize prices of local television advertising time.

86.     Defendants' conspiracy had the following effects, among others:

(a)     Price competition in the market for local television advertisements has been restrained, suppressed, and/or eliminated;

(b)     Prices for local television advertisement time provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the U.S.; and

(c)     Plaintiff and members of the Class who purchased local television advertisement time from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

87.     Plaintiff and members of the Class have been injured and will continue to be injured in their business and property by paying more for local television advertising time purchased from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

88.     The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

89.     Plaintiff and members of the Class are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff and the Class respectfully request the following relief:

A.     That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.     The Court adjudge and decree that the acts of the Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.     The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other offices, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination allege herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.     That Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiff and members of the Class for treble the amount of damages sustained by Plaintiff and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

E.     That each of the Defendants, and their respective successors, assigns, parent, subsidiaries, affiliates, and transferees, and their officers, directors, agents, and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding, or concert of action as alleged herein; and

F.     That the Court award Plaintiff and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: September 25, 2018

**LOWEY DANNENBERG, P.C.**


By:   <u>/s/ Barbara J. Hart</u>_____
        Barbara J. Hart
        Scott V. Papp
        44 South Broadway, Suite 1100
        White Plains, NY 10601
        Tel.: 914-997-0500
        E-mail: bhart@lowey.com
        E-mail:: spapp@lowey.com


        *Counsel for Plaintiff and the Proposed Class*